**HEADNOTE:** *Jonathan Rose v. Andrea Rose*, No. 432, September 2017 Term

**CHILD SUPPORT — USE OF "SHARED PHYSICAL CUSTODY" TO CALCULATE SUPPORT UNDER MARYLAND CHILD SUPPORT GUIDELINES — APPLICATION OF FAMILY LAW ARTICLE SECTION 12-201(n).**

As part of their divorce, Jonathan Rose and Andrea Rose executed a comprehensive Separation and Property Settlement Agreement ("Agreement"). The Agreement provided that child support would be recalculated annually using the Maryland Child Support Guidelines. Although a Consent Custody Order entered into by the parties provided Jonathan with 35%-36% of the annual overnights with the children, Andrea presented evidence that Jonathan never kept the children more than 35% of the overnights. Accordingly, Andrea argued that Jonathan was not entitled to have his child support calculated under the "shared physical custody" provisions of the Guidelines. The circuit court decided not to receive evidence concerning the actual number of overnights Jonathan kept the children. Instead, the court calculated child support by relying on the number of overnights awarded in the Consent Custody Order, and therefore used the shared physical custody formula.

*Held:* Judgment of the circuit court reversed and case remanded for further proceedings. The plain language of section 12-201(n)(1) of the Family Law Article ("FL") requires a parent to keep a child more than 35% of the overnights in order to receive the benefit of shared physical custody for child support purposes. If a parent establishes that he or she actually keeps the child overnight for more than 35% of the year, the court's analysis should begin and end with FL § 12-201(n)(1).

If, on the other hand, a parent cannot demonstrate that he or she keeps the child for more than 35% of the overnights even though the extant visitation order awards that parent more than 35% of the overnight visitation, the court may, in its discretion, nevertheless use the shared physical custody child support formula as authorized by FL § 12-201(n)(2). In exercising its discretion under FL § 12-201(n)(2), the court may consider evidence concerning the parent's failure to keep the child more than 35% of the overnights as awarded in the visitation order.

On remand, the circuit court should make the threshold factual determination under FL § 12-201(n)(1) whether Jonathan actually kept the children for more than 35% of the overnights in a year. If there were legally sufficient evidence that Jonathan kept the children more than 35% of the overnights, the statutory definition of "shared physical custody" in FL § 12-201(n)(1) would be satisfied and child support would be calculated accordingly. If, on the other hand, the evidence demonstrated that Jonathan had not met the 35% of actual overnights threshold, Jonathan may request the court to use the shared physical custody child support formula based on the amount of visitation *awarded* in the Consent Custody Order, but *only if* the court determines that the Consent Custody Order

on its face gives Jonathan 35% or more of the overnights.  Assuming that the Consent Custody Order awards Jonathan more than 35% of the overnights, the court may then exercise its considered discretion pursuant to FL § 12-201(n)(2) to calculate child support based on shared physical custody.

Circuit Court for Montgomery County
Case No. 85056-FL

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 432

September Term, 2017

JONATHAN ROSE

v.

ANDREA ROSE

Friedman,
Beachley,
Moylan, Charles E.
  (Senior Judge, Specially Assigned),

JJ.

Opinion by Beachley, J.

Filed: February 1, 2018

Jonathan Rose ("Jonathan") appeals from a judgment of the Circuit Court for Montgomery County denying his motion to terminate his alimony obligation to his former wife, Andrea Rose ("Andrea"). Jonathan also appeals the circuit court's denial of his motion to alter or amend judgment related to the court's determination that, pursuant to the parties' separation agreement, Jonathan owed $18,612.37 for expenses related to the parties' children. Jonathan presents the following issues on appeal, which we have slightly rephrased:

I. Whether the circuit court erred when it gave dispositive weight to the fifth factor in *Gordon v. Gordon*, 342 Md. 294 (1996) (whether the cohabitants held themselves out as a married couple) when denying Jonathan's motion to terminate alimony?

II. Whether the circuit court erred in its denial of Jonathan's Motion to Amend or Alter Amended Judgment?

Andrea noted a cross-appeal in which she challenges the circuit court's calculation of child support. We condense Andrea's questions presented into a single issue: Did the circuit court err in utilizing the "shared physical custody" formula contained in the Maryland Child Support Guidelines where the evidence demonstrated that Jonathan had not actually kept the children more than 35% of the overnights as required by the Guidelines?

For the reasons that follow, we shall reverse the circuit court on its child support determination, but otherwise affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

The parties were divorced by a judgment entered on December 14, 2011. That judgment incorporated, but did not merge, the parties' Separation and Property Settlement Agreement ("Agreement") dated December 9, 2011. The Agreement provided that Jonathan would pay non-modifiable alimony for a term of eight years beginning January 1, 2012, and ending December 31, 2019. The Agreement further provided that Jonathan's alimony obligation would terminate "upon the earlier of (a) Jonathan's death; (b) Andrea's death; (c) Andrea's remarriage; (d) Andrea's cohabitation (as defined by *Gordon v. Gordon*, 675 A.2d 540 (1996)), or [(e)] December 31, 2019."

In June 2016, Jonathan filed a "Motion to Confirm Termination of Alimony Pursuant to the Separation and Property Settlement Agreement." In his motion, Jonathan alleged that Andrea "is and/or has been cohabitating (as defined by the Settlement Agreement) with Michael Chreky since at least August 2015." Jonathan therefore sought termination of his alimony obligation as well as reimbursement from Andrea for any alimony payments Jonathan made while she was cohabiting with Mr. Chreky.

The circuit court received evidence on Jonathan's motion to terminate alimony on October 27, 2016, and November 3, 2016. Because their Agreement expressly incorporated *Gordon*'s definition of cohabitation as a terminating event for the payment of alimony, both parties produced evidence concerning *Gordon*'s non-exhaustive list of factors relevant to determining cohabitation. At the conclusion of the evidence, the trial court evaluated each of the five factors enumerated in *Gordon* and determined that the

2

evidence was insufficient to establish cohabitation between Andrea and Mr. Chreky. Accordingly, the court denied Jonathan's request to terminate alimony.

The circuit court also heard Andrea's motions concerning her request to recalculate child support pursuant to the Agreement, as well as her claim for reimbursement of "shared expenses" related to the children's education, health care, and extracurricular activities. As to child support, the Agreement provided that, beginning in 2013, the parties would annually "recalculate Jonathan's child support obligation based upon the Maryland Child Support Guidelines[.]"

The parties disagreed whether Jonathan's child support obligation should be calculated based on the "shared" or "sole" custody formula contained in the Guidelines. Jonathan contended that because the Consent Custody Order, agreed to by the parties in 2010, gives him the authority to exercise visitation for five out of every fourteen overnights, or 36% of all overnights, he met the 35% threshold for "shared custody" as provided in the Guidelines. Andrea contended that the determinative factor for child support purposes is the *actual* number of overnights that a parent keeps a child. Because Andrea produced evidence that for the years 2012 through 2015, inclusive, Jonathan only kept the children for 26% to 33% of all overnights, she argued that Jonathan did not meet the 35% threshold for shared custody as set forth in the Guidelines. Rather, she contended that child support should be calculated using the sole custody formula. Agreeing with Jonathan, the circuit court relied on the overnights awarded in the Consent Custody Order and used the shared custody formula to calculate child support, leading to Andrea's cross-appeal.

3

Finally, the court found that Jonathan owed Andrea $18,612.37 in shared expenses related to the children as provided in the Agreement. As a result of that determination, Jonathan filed a "Motion to Amend or Alter Amended Judgment," the substance of which we will discuss *infra*. The court denied that motion, which Jonathan challenges on appeal.

## I. Jonathan's Motion to Terminate Alimony

The parties agree that the following provision contained in Paragraph 10 of their Agreement governs whether Jonathan is entitled to terminate his alimony obligation:

> Jonathan's alimony obligation shall terminate, except as to any arrearages, upon the earlier of (a) Jonathan's death; (b) Andrea's death; (c) Andrea's remarriage; (d) Andrea's cohabitation (as defined by *Gordon v. Gordon*, 675 A.2d 540 (1996)), or [(e)] December 31, 2019, whichever occurs first.

The parties further agree that the only potential terminating event relevant here is subsection (d) of Paragraph 10—whether Andrea was cohabiting with Mr. Chreky as defined by *Gordon*.

Because the parties incorporated *Gordon*'s definition of cohabitation in their Agreement, we begin our analysis by reciting the *Gordon* Court's definition of "cohabitation:"

> We conclude that the term "cohabitation" implies more than merely a common residence or a sexual relationship. We believe the ordinary definition of "cohabitation," describing a relationship of living together "as man and wife," connotes mutual assumption of the duties and obligations associated with marriage. To guide trial courts in applying this definition, we have formulated a list of factors to consider in determining whether a relationship constitutes cohabitation. We emphasize, however, that the list is non-exhaustive, and that no one factor serves as an absolute prerequisite for cohabitation. In interpreting "cohabitation," courts may consider indicia such as:

4

> 1. establishment of a common residence;
> 2. long-term intimate or romantic involvement;
> 3. shared assets or common bank accounts;
> 4. joint contribution to household expenses; and
> 5. recognition of the relationship by the community.

342 Md. at 308-09 (footnotes omitted).

### A. The Parties' Contentions

Jonathan asserts that the circuit court "unequivocally" found that the evidence established the first four *Gordon* factors. In his opening brief, Jonathan's principal challenge is that the trial court erred in its application of *Gordon*'s fifth factor. In his view, because the Court of Appeals in *Gordon* "expressly declined to require that couples hold themselves out to be spouses to be deemed 'cohabitating,'" the court erred when it gave "dispositive weight" to its factual determination that there was no evidence as to how Andrea and Mr. Chreky held themselves out to the community. Alternatively, Jonathan posits that "there was evidence presented that Ms. Rose and Mr. Chreky held themselves out as a cohabitating couple to their families."

Andrea disagrees with Jonathan's interpretation of the trial court's determinations pertaining to the first four *Gordon* factors. While she acknowledges that the court found the existence of a common residence (factor one) and a long-term intimate or romantic relationship between herself and Mr. Chreky (factor two), she disputes Jonathan's assertion that the court's findings as to the third and fourth factors (shared assets or common bank accounts, and joint contribution to household expenses) favored a finding of cohabitation. To the contrary, Andrea claims that the court found that the evidence did not support these factors, thereby supporting her contention that she was not cohabiting with Mr. Chreky.

5

As to the fifth factor, Andrea asserts that the trial court correctly concluded that "there wasn't one shred of evidence from anybody as to how they held themselves out." Andrea therefore argues that, after weighing all of the relevant factors, the court appropriately determined that the evidence did not establish "cohabitation" as defined in *Gordon*.

## B. The Trial Court's Decision

In rendering its bench opinion, the trial court initially noted that the parties expressly incorporated *Gordon*'s definition of cohabitation as one of the terminating events for the payment of alimony. The court proceeded to consider each of the indicia of cohabitation as enumerated in *Gordon*. The court found the existence of the first two factors: establishment of a common residence and a long-term intimate relationship between Andrea and Mr. Chreky.[1] As to the third factor—shared assets or common bank accounts—the court stated that "[t]hey haven't shared any assets beyond the house." The court expressly determined that Andrea and Mr. Chreky had no common bank accounts. Although Andrea had made loans to Mr. Chreky, the court noted that Mr. Chreky repaid those loans with interest. The court concluded, "So with respect to the common bank accounts and the lending of money, [the court] thinks that militates in [Andrea's] favor."

---

[1] Jonathan argues that because the court found that Andrea and Mr. Chreky attempted to conceal their true living arrangement, the court erred in not finding cohabitation. Because the court resolved the first two factors from *Gordon* in Jonathan's favor, we reject this contention.

Moving to the fourth *Gordon* factor—joint contribution to household expenses—the court found that, although Mr. Chreky made some non-monetary contributions to Andrea's household,[2] there were no joint contributions to household expenses.

In considering *Gordon*'s fifth factor—recognition of the relationship by the community—the trial court recognized *Gordon*'s admonition that Maryland law does not "interpret 'cohabitation' to require the couple to hold themselves out as spouses." 342 Md. at 309. The court then stated that "there wasn't one shred of evidence from anybody as to how [Andrea and Mr. Chreky] held themselves out."

After reviewing the evidence related to each of the five *Gordon* factors, the trial judge concluded that "when I weigh all of the factors together, I'm not convinced that there was cohabitation under [*Gordon*]." Though the court opined that this was a "close" case, it ultimately determined, "under all the facts and circumstances of this relationship," that cohabitation between Andrea and Mr. Chreky had not been established. The court consequently denied Jonathan's motion to terminate alimony.

### C. Standard of Review

In *Gordon*, the Court of Appeals stated that "[t]he determination of whether an arrangement constitutes 'cohabitation' is a factual issue to be decided on the specific facts of each case." *Id*. at 304 (citing *In re Marriage of Edwards*, 698 P.2d 542, 546 (Or. Ct. App. 1985)). *See also Ricketts v. Ricketts*, 393 Md. 479, 485 n.3 (2006) ("Whether the

---

[2] These non-monetary contributions included walking the dogs and taking the children to school.

parties cohabited, or not, is clearly a question of fact."). Accordingly, the "clearly erroneous" standard of review applies to the trial court's determination here that the evidence failed to prove that Andrea and Mr. Chreky were cohabiting. Under that standard of review, "[a]s long as the trial court's findings of fact are not clearly erroneous and the ultimate decision is not arbitrary, we will affirm it, even if we might have reached a different result." *Malin v. Mininberg*, 153 Md. App. 358, 415 (2003). Where, however, a decision "involves an interpretation and application of statutory and case law, the appellate court must determine whether the circuit court's conclusions are 'legally correct' under a *de novo* standard of review." *Brandenburg v. LaBarre*, 193 Md. App. 178, 186 (2010).

### D. Discussion

We initially note that neither party challenges the trial court's use of *Gordon* as its legal guidepost for determining whether Andrea cohabited with Mr. Chreky. Any such challenge would be fruitless in that the parties explicitly incorporated *Gordon*'s definition of cohabitation in their Agreement.

We conclude that the trial court's factual findings as to the five *Gordon* factors were not clearly erroneous. As noted previously, the parties do not dispute the court's findings that Andrea and Mr. Chreky had established a common residence and maintained a long-term intimate relationship. Contrary to Jonathan's assertion, the court determined that the third *Gordon* factor—shared assets or common bank accounts—weighed against a finding of cohabitation, expressly finding that "[t]hey haven't shared any assets beyond the house." In addressing *Gordon*'s fourth factor, the court found that there were no joint contributions to household expenses. Again, contrary to Jonathan's assertion, that finding weighed

8

against a determination of cohabitation in this case. In short, Jonathan misinterprets the trial court's conclusions as to *Gordon*'s third and fourth factors.

As to *Gordon*'s fifth factor—recognition of the relationship by the community—Jonathan is correct that the Court of Appeals stated "we do not interpret 'cohabitation' to require the couple to hold themselves out as spouses." 342 Md. at 309. Citing *Sitarek v. Sitarek*, 179 A.D.2d 1064, 1065 (N.Y. App. Div. 1993), the *Gordon* Court contrasted New York's concept of "cohabitation," which *requires* proof of the parties holding themselves out as a married couple. 342 Md. at 309. Instead, *Gordon* merely relegates "recognition of the relationship by the community" as one factor in the "cohabitation" analysis. In addition, the Court provided further guidance concerning the meaning of that fifth factor:

> We include the fifth factor, recognition of the relationship by the community, however, to address situations where parties have celebrated an unofficial marriage ceremony, wear wedding rings, use each others' names, *or otherwise indicate to the community that they are married*.

*Id*. (emphasis added).

Applying *Gordon*'s fifth factor to the case at bar, there was no evidence that Andrea and Mr. Chreky celebrated an unofficial marriage ceremony, wore wedding rings, or used each other's names. Likewise, there was no evidence that Andrea and Mr. Chreky held themselves out to the community as a *married* couple.[3] The trial court was therefore correct in determining that the fifth factor weighed against a finding of cohabitation.

---

[3] As to *Gordon*'s fifth factor, Jonathan relies on evidence that Mr. Chreky's daughter also resided in Andrea's household; that Mr. Chreky and his daughter enjoyed family vacations with Andrea and her children; that Mr. Chreky's mother stayed in Andrea's home for a period of time; and that Andrea and Mr. Chreky held a religious party to celebrate

9

After evaluating each of the *Gordon* factors, the trial judge stated that "I'm not convinced that there was cohabitation" as defined in *Gordon* and "I just don't believe that there was a de facto marriage here." The trial court's determination is consistent with *Gordon*'s observation that "'cohabitation' implies more than merely a common residence or a sexual relationship[,]" and that it "connotes mutual assumption of the duties and obligations associated with marriage." *Id*. at 308. We conclude that the trial court's factual findings are not clearly erroneous and that its ultimate decision that Andrea did not cohabit with Mr. Chreky is not arbitrary. *Malin*, 153 Md. App. at 415. Moreover, we reject Jonathan's contention that the court gave "dispositive weight" to *Gordon*'s fifth factor. It did no such thing. We also unequivocally reject Jonathan's suggestion that *Gordon* creates a cohabitation scorecard in which the existence of three out of the five factors equates to a finding of "cohabitation." We reiterate that *Gordon* merely enumerates a non-exhaustive list of factors intended to guide trial courts when called upon to determine whether "cohabitation" has been established. We therefore affirm the circuit court's denial of Jonathan's motion to terminate alimony.

---

their birthdays with extended families in attendance. While this evidence was relevant for the purpose of evaluating the extent of Andrea's relationship with Mr. Chreky, it had little or no relevance to whether Andrea and Mr. Chreky held themselves out as a *married* couple.

**II. Denial of Jonathan's Motion to Alter or Amend Judgment**

On February 6, 2017, Jonathan filed, pursuant to Rule 2-534, a motion to alter or amend the court's judgment docketed on January 26, 2017.[4] Jonathan's Rule 2-534 motion challenged both the circuit court's denial of his motion to terminate alimony and its award of $18,612.37 in favor of Andrea representing Jonathan's share of expenses related to the children. In his appellate brief, Jonathan's challenge to the circuit court's denial of his motion to alter or amend is limited to the judgment against him for his share of the children's expenses. Accordingly, we shall limit our review of the court's denial of Jonathan's motion to alter or amend as it pertains to the assessment of shared expenses for the children.

Maryland Rule 2-534 governs the court's revisory power over judgments:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial. A motion to alter or amend a judgment filed after the announcement or signing by the trial court of a judgment but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

Appellate review of a court's ruling on a 2-534 motion is typically limited in scope. *Schlotzhauer v. Morton*, 224 Md. App. 72, 84 (2015) (citing *Cent. Truck Ctr. v. Cent. GMC, Inc.*, 194 Md. App. 375, 397 (2010)).

---

[4] Jonathan's motion was titled "Motion to Amend or Alter Amended Judgment, Pursuant to Rule 2-534, and For Other Relief."

> In general, the denial of a motion to alter or amend a judgment is reviewed by appellate courts for abuse of discretion. The relevance of an asserted legal error, of substantive law, procedural requirements, or fact-finding unsupported by substantial evidence, lies in whether there has been such an abuse.

*Id*. (internal citations omitted). We note, however, that a "court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case." *Arrington v. State*, 411 Md. 524, 552 (2009).

The basis for Andrea's claim for shared expenses is found in Paragraphs 7, 8, and 9 of the Agreement. In their Agreement, the following expenses related to the children were to be shared on a *pro rata* basis according to the parties' incomes: private school expenses (Paragraph 7); extraordinary unreimbursed medical, dental, and therapy expenses (Paragraph 8); and expenses for agreed-upon extra-curricular activities (Paragraph 9). At trial, Andrea introduced an itemized list of expenses related to the children for which she sought reimbursement from Jonathan based on their respective incomes. The court ultimately accepted Andrea's itemized list of shared expenses and ordered Jonathan to pay Andrea $18,612.37 representing his *pro rata* share of those expenses.

On appeal, Jonathan disputes the reimbursement for three reasons. First, he claims that some of the expenses Andrea submitted did not qualify as reimbursable expenses under the Agreement. Second, Jonathan contends that the court erroneously precluded him from testifying about the shared expenses Andrea claimed. Third, Jonathan asserts that he "paid a number of child-related expenses for which he had not been reimbursed."

We can summarily dismiss Jonathan's third argument. After Andrea's counsel noted that Jonathan refused to answer any discovery pertaining to shared expenses

12

Jonathan allegedly paid on behalf of the children, Jonathan's counsel stated, "[Jonathan's] not asking for an offset for what he's paying." That statement, in our view, constituted a waiver of any reimbursement claim Jonathan may have had against Andrea for shared expenses he paid on behalf of the children.

As to Jonathan's other two claims regarding the shared expenses, we note that Andrea interposed an objection to Jonathan's testimony concerning the shared expenses on the basis that Jonathan failed to comply with Andrea's pre-trial discovery requests directed to that issue. The court sustained the objection, and precluded Jonathan from testifying on the subject as a sanction for Jonathan's discovery violation. When Jonathan's counsel asked the court if he could dispute whether some of Andrea's claimed expenses qualified for reimbursement under the Agreement, the court reiterated,

> No. Your client had the opportunity to dispute the expenses that he disputed, and he didn't do it. And [the court] asked him to acknowledge these are the expenses. If you disagree these are expenses, tell us which one you disagree with . . . and he didn't even answer it.

We cannot say that the trial court abused its discretion. Maryland Rule 2-433(a)(3) gives trial courts broad discretion to impose sanctions for discovery violations, ranging from striking pleadings to dismissal. "Our review of the trial court's resolution of a discovery dispute is quite narrow; appellate courts are reluctant to second-guess the decision of a trial judge to impose sanctions for a failure of discovery." *Sindler v. Litman*, 166 Md. App. 90, 123 (2005). In *Wilson v. John Crane, Inc.*, the Court of Appeals stated,

> There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding rules or principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against the

13

logic and effect of facts and inferences before the court[ ]' . . . or when the ruling is 'violative of fact and logic.'

Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' In sum, to be reversed '[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'

385 Md. 185, 198-99 (2005) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312-13 (1997)). In light of Jonathan's complete failure to provide discovery related to the children's shared expenses, we decline to second-guess the trial court's decision to preclude Jonathan from challenging whether those expenses were reimbursable under the Agreement.

### III. Calculation of Child Support

In Andrea's cross-appeal, she argues that because Jonathan never kept the children more than 35% of the overnights in any year, the circuit court erred in using the "shared physical custody" formula to calculate Jonathan's child support obligation. Andrea's argument is based on Md. Code (1984, 2012 Repl. Vol., 2017 Supp.) § 12-201(n) of the Family Law Article ("FL") which defines "shared physical custody" as each parent "keep[ing] the child or children overnight for more than 35% of the year[.]"[5]

This issue was framed by the parties at the outset of trial when Jonathan moved for summary judgment, arguing that the *shared* custody formula should apply because the

---

[5] FL § 12-204(m) provides the specific formula to be used to calculate child support in instances of "shared physical custody."

Consent Custody Order entitled him to keep the children for more than 35% of the annual overnights. Andrea responded that the *sole* custody formula should apply because Jonathan was not actually keeping the children for the statutorily prescribed 35% of the overnights. The trial court denied Jonathan's motion for summary judgment, stating that it would receive evidence and make a determination based on its findings at trial.

During trial, the court heard testimony from Andrea that, since the entry of the Consent Custody Order, the children had not stayed overnight with Jonathan for more than 35% of the overnights in any given calendar year. The court also admitted into evidence a custody calendar and notes Andrea composed, which indicated that Jonathan kept the children for 33% of overnights in 2012, 28% of overnights in 2013, 26% of overnights in 2014, 26% of overnights in 2015, and 28% of overnights through March 6, 2016.

Due to time constraints and scheduling concerns, the court refused to hear testimony from Jonathan on this issue. Stating that there was not enough time to evaluate the evidence, the court simply based the child support calculations on the amount of overnights awarded in the Consent Custody Order:

THE COURT: Okay, I'll say it again. *We're going to calculate the guidelines based on the number of overnights he's scheduled for on the record or in their agreement. That's what we're going to use to calculate the guidelines.*

I recognize her testimony is different. His testimony is different from hers. *I'm not going to take the time -- and I think I said that to start with -- to go through and see whose proof is the best for how many overnights they had.* I'm going to go with what the agreement was. Okay? There's no -- that's just the way we're going to do it.

15

It's 25 minutes to 5:00. This is now day two. And I'm not going to go through and have them litigate each day that the kids did or didn't come there, or whether they were with the boyfriend, and he was taking care of them, or whether they were in the hospital. I'm not doing that. Okay?

*I'm doing it based on however many overnights are provided for on the record in this case.* If he hasn't taken them, okay. He didn't take them. He says he did take them, and he took "X" nights with Andrew. There's a provision in there that if Sarah, who's having problems, doesn't want to come with him all the time, she doesn't have to come with him. And maybe your client kept track of all the times she did or she didn't come, or was out of town or wasn't out of town. We're not going to go through that. They've [sic] haven't allotted enough time to do that.

I'm going to base the child support calculations, or you are, on what's in here. *However many overnights are provided for per year, in here, that's what we're going by.* All right? That's my ruling.

(Emphasis added).

Andrea argues on appeal that the trial court erred in basing Jonathan's child support obligation on the amount of overnights *awarded* in the Consent Custody Order. In her view, a parent must keep the children more than 35% of the overnights per year in order to receive the benefit of the shared custody formula for child support, pursuant to the Maryland Child Support Guidelines. FL § 12-201 *et seq*. Because she produced evidence that Jonathan did not keep the children more than 35% of the overnights in any prior year, Andrea argues that the trial court was required to use the sole custody formula to calculate child support.

Resolution of this case requires interpretation of FL § 12-201(n) which provides:

16

(n)(1) "Shared physical custody" means that each parent keeps the child or children overnight for more than 35% of the year and that both parents contribute to the expenses of the child or children in addition to the payment of child support.

(2) Subject to paragraph (1) of this subsection, the court may base a child support award on shared physical custody:

> (i) solely on the amount of visitation awarded; and
> (ii) regardless of whether joint custody has been granted.

We review *de novo* a trial court's interpretation and application of a statute. *Wyatt v. State*, 169 Md. App. 394, 400 (2006) (citing *Cain v. State*, 386 Md. 320, 327 (2005)). In construing the meaning of a statute,

> The primary goal of statutory construction is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]" In so doing, we look first to the "normal, plain meaning of the language of the statute," read as a whole so that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. . . ." Where the language of the statute is ambiguous and may be subject to more than one interpretation, however, we look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature.

*Whitley v. Maryland State Bd. of Elections*, 429 Md. 132, 149 (2012) (citations and quotation marks omitted).

The plain language of FL § 12-201(n)(1) defines "shared physical custody" as occurring when each parent "keeps" the child or children overnight for more than 35% of the year and contributes to the expenses of the child or children in addition to child support payments. *Black's Law Dictionary* (10th ed. 2014) defines a "keeper" as "Someone who has the care, custody, or management of something and who [usually] is legally responsible for it." We think that the plain meaning of the word "keeps" means to maintain actual

17

possession, or in this case, for a child to actually stay with the parent overnight. We find support for our interpretation of the word "keeps" in this context in *Guidash v. Tome*, 211 Md. App. 725 (2013). There, we described the 35% threshold for "shared physical custody" as follows: "a child must stay overnight with each parent for a minimum of 128 nights[6] to trigger a shared custody child support calculation." *Id*. at 748-49. Thus, if a parent can demonstrate that a child stays with that parent more than 35% of the overnights in a year, then "shared physical custody" is established, pursuant to FL § 12-201(n)(1), for the calculation of child support.

On the other hand, FL § 12-201(n)(2) provides that, "*Subject to paragraph (1) of this subsection*, the court *may* base a child support award on shared physical custody: (i) solely on the amount of visitation *awarded*[.]" (Emphasis added). The plain meaning of this subsection makes two things clear. First, that FL § 12-201(n)(2) is subject to FL § 12-201(n)(1), meaning that a court cannot grant child support based on shared physical custody unless it first determines that the amount of visitation *awarded* in the extant order exceeds 35% of the overnights per year. Second, the word "may," by its definition, generally "connotes a discretionary act, *i.e.*, one that is not required." *Heit v. Stansbury*, 199 Md. App. 155, 158 (2011). Although it is discretionary for a court to rely on a court-ordered award of visitation when determining shared physical custody for child support purposes, a court may only exercise such discretion after determining that the order actually *awards* a parent more than 35% of the overnights per year. *Cf. Lee v. Andochick*, 182 Md.

---

[6] 128 overnights represents 35% of the overnights in a year.

App. 268, 293-94 (2008) (holding that "court has discretion as to whether to base a child support award on shared physical custody" under the predecessor to FL 12-201(n)(2)).

A few examples based on common family law scenarios will assist in understanding FL § 12-201(n). If a parent establishes that he or she actually keeps the child overnight for more than 35% of the year, then the court's analysis should begin and end with FL § 12-201(n)(1). Under that scenario, the parent would be entitled to have child support based on the shared physical custody formula set forth in FL § 12-204(m). If, on the other hand, the parent cannot demonstrate that he or she keeps the child for more than 35% of the overnights, then that parent may request the court to exercise its discretion pursuant to FL § 12-201(n)(2) to utilize the shared physical custody child support formula based on the amount of visitation *awarded*. The court, however, may only exercise its discretion under FL § 12-201(n)(2) if the amount of visitation awarded exceeds 35% of the overnights as mandated in subsection (n)(1). In other words, (n)(1) *requires* the court to use the shared physical custody formula for child support where a parent has actually kept the child for more than 35% of the overnights, while (n)(2) *permits* the court, in its discretion, to use the shared physical custody formula where a parent is awarded more than 35% of the overnights, but has actually kept the child for 35% (or fewer) of the overnights.[7]

---

[7] We note that a court could also rely on FL § 12-201(n)(2) to establish prospective child support as part of an initial determination or modification of custody, provided that the award gives a parent more than 35% of the overnights per year.

19

We now turn to apply FL § 12-201(n) to the instant case. After Andrea presented evidence that Jonathan had never kept the children for more than 35% of the overnights in any prior year, the trial court should have permitted Jonathan to present evidence to attempt to prove that he had in fact kept the children more than 35% of the overnights in one or more prior years. The trial court therefore erred by not making the threshold factual determination under FL § 12-201(n)(1) whether Jonathan actually kept the children for more than 35% of the overnights in a year. If there were legally sufficient evidence that Jonathan kept the children more than 35% of the overnights, the statutory definition of "shared physical custody" in FL § 12-201(n)(1) would be satisfied and child support would be calculated accordingly. If, on the other hand, the evidence demonstrated that Jonathan had not met the 35% of actual overnights threshold, Jonathan could request the court to use the shared physical custody child support formula based on the amount of visitation *awarded* in the Consent Custody Order, but *only if* the court determined that the Consent Custody Order on its face gave Jonathan 35% or more of the overnights.[8] Assuming for our purposes that the Consent Custody Order awarded Jonathan more than 35% of the overnights, the court could then exercise its considered discretion to calculate child support based on shared physical custody. In exercising its discretion, the court would likely need to consider why the awarded visitation was not actually exercised by the parent. We cannot

---

[8] In her brief, Andrea concedes that, under the Consent Custody Order, Jonathan was awarded 35%-36% of the overnights beginning in February 2011. The circuit court should determine the exact percentage on remand.

20

possibly articulate the universe of relevant evidence in such cases, but relevant evidence might include: 1) whether the primary custodial parent obstructed the non-custodial parent's overnight visitation; 2) whether a child was hospitalized or otherwise unable to be with the non-custodial parent for overnight visitation; and 3) whether the parents, acting jointly in the best interest of their child, agreed to temporarily limit overnight visitation with the non-custodial parent. In sum, if a court determines that there is good reason for a parent's failure to keep a child more than 35% of the overnights as awarded in an order, the court could, under subsection (n)(2), calculate child support based on shared physical custody.

For these reasons, we hold that the trial court erred by ignoring the plain meaning of FL § 12-201(n). *See Bass v. State*, 206 Md. App. 1, 11 (2012) (stating that it is an abuse of discretion to exercise discretion based upon an error of law). On remand, both parties should be afforded the opportunity to present evidence relevant to determining the appropriate child support formula as prescribed by FL § 12-201(n).[9]

---

[9] We reject Jonathan's argument that the circuit court did not have the authority to calculate child support for the years 2013 through 2016. Jonathan's argument is based on FL § 12-101(a)(3), which provides: "For any other pleading that requests child support, the court may award child support for a period from the filing of the pleading that requests child support." In Jonathan's view, FL § 12-101(a)(3) precludes the court from awarding child support for any period prior to April 29, 2016, the date Andrea filed her motion to enforce recalculated child support. We reject Jonathan's contention because Andrea merely sought enforcement of paragraph 6 of the parties' Separation and Property Settlement Agreement, which expressly provides for an annual recalculation of child support commencing in 2013. FL 12-101(a)(3) is therefore inapplicable. Further, we express no view on the merits of Jonathan's argument that the circuit court did not have the statutory authority to make child support retroactive to 2013.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**